William H. Malone v. Commissioner.
William H. Malone v. Commissioner
Docket Nos. 76350, 76855, 77029.
United States Tax Court
1945 Tax Ct. Memo LEXIS 13; 4 T.C.M. (CCH) 1133; T.C.M. (RIA) 45373; December 17, 1945
*13 During each of the years 1926 to 1932, inclusive, taxpayer made large currency deposits, the source of which was not disclosed on his books and which he failed to report for income tax purposes and did not satisfactorily explain. Held, such amounts constituted taxable income to the taxpayer in each year. Held, further, the fraud penalties are approved. S. J. Konenkamp, Esq., and Oscar W. Harman, Esq., for the petitioner. John D. Kiley, Esq., and Richard L. Greene, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion These proceedings involve deficiencies in income tax, together with fraud penalties and interest, determined by the respondent against William H. Malone for the years and in the amounts stated, as follows: Year
Deficiency
Penalty
Interest
Total
1926
$28,063.87
$14,031.94
$42,095.81
1927
29,866.30
14,933.15
44,799.45
1928
60,112.36
30,056.18
90,168.54
1929
59,287.45
29,643.73
$14,176.19
103,107.37
1930
1,266.40
633.20
226.82
2,126.42
1931
2,586.72
1,293.36
308.10
4,188.18
1932
140.52
70.26
8.30
219.08
The principal issues are: (1) Whether the petitioner *14 received income during each of the years in controversy which he failed to report for Federal income tax purposes, and (2) whether the respondent properly asserted a 50 per cent fraud penalty for each of the years involved. The respondent also made several other adjustments in the petitioner's income for each of the years in question, all of which were put in issue by the petitioner. In addition, the petitioner raised several new matters in his petition. He now concedes that the adjustments for the year 1932 are correct, with the exception of the determination that he received unreported "other income" for that year. He also concedes certain minor adjustments for the years 1927 and 1930. While none of the other issues are specifically abandoned or conceded by the petitioner, evidence was introduced with respect to the following only: (3) Whether or not the petitioner may eliminate from his income for 1926 an amount representing a partial duplication of gain reported on his 1925 return. (4) Whether or not the petitioner is entitled to a deduction for 1926 in the amount of $3,680 for charitable contributions alleged to have been made in that year; and (5) whether or not the *15 petitioner sustained a deductible loss in 1927 of $19,070.43 upon the liquidation of a corporation known as home Realty Company. Findings of Fact The petitioner is an individual residing in Park Ridge, Illinois. The returns for the years in controversy were prepared on the cash basis and were filed with the collector of internal revenue for the first district of Illinois. The petitioner moved to Chicago about 1901 and was first employed in a drugstore. Subsequently he was employed for about a year and a half by Carlton & Hovey Company, a manufacturer of pharmaceuticals. He then went to Tiffin, Ohio, where he entered an organization for the making of pharmaceutical remedies. After the dissolution of that firm, the petitioner returned to Chicago where he entered the sand and gravel business. This venture failed about 1911 or 1912. The petitioner has lived in Park Ridge for about 40 years. Around 1910 he was elected mayor of that city and served one term. In 1912 the petitioner was elected to the Board of Equalization of the State of Illinois, a position he held until 1918, when the Board was abolished by legislative act. He received a salary of $1,000 per year as a member of *16 the Board. In 1914 the petitioner was an unsuccessful candidate for the United States Congress. The petitioner, in 1917, became a broker in road oil and flux oil. Some time prior to 1919 this business was incorporated under the name of Illinois Petroleum Products Company. In 1921 the name of the corporation was changed to American-Mexican Refining Company. The petitioner held a majority stock interest in both companies until about 1929. He also served as president, for which he received a salary of $12,000 per year, from which office he resigned prior to 1926. During the years 1926 to 1929, inclusive, he received a salary of $12,000 per year from the company, the same salary he had theretofore received as president. In addition to his oil brokerage business, the petitioner had at various times engaged in the real estate business and in building and construction. In 1921 the petitioner was appointed to the Illinois State Tax Commission, hereinafter called the Tax Commission. He was a member of the Tax Commission continuously from the time of his appointment until he resigned in January, 1931. He served as chairman from 1925 until his resignation. His salary during the entire *17 period was $6,000 per year. In 1931 petitioner was an unsuccessful candidate for nomination for Governor of Illinois. During the taxable years here involved the petitioner was a customer of several banks, including the Norwood Park Trust and Savings Bank, Park Ridge State Bank, Citizens State Bank of Park Ridge of which he was president, Greenebaum Sons Bank and Trust Company, National Bank of the Republic, Boulevard State Savings Bank, Foreman National Bank, East Side Bank of Milwaukee, and Jefferson Park National Bank. During the same years the petitioner made numerous deposits of currency at various banks, made unidentified bank deposits, used currency in the payment of notes, to purchase cashier's checks, to purchase a certificate of deposit, securities, stock, to make various payments and a loan, all of which represents funds not accounted for or reflected in his income tax returns for those years, in the following manner and amounts: 1926
1927
1928
1929
1930
1931
1932
Currency deposits at: Jefferson Pk. Nat'l Bank
$36,235
$76,700.00
$62,906.00
$100,037.50
$22,550
$50,493.75
$13,000
Greenebaum Sons Bank &
Trust Co.
18,500
12,600.00
200.00
National Bank of the Re-
public
65,000.00
Park Ridge State Bank
14,855
Citizens State Bank
5,130.00
1,965
750.00
30,590
Norwood Park Trust &
Savings Bank
58
1,438.50
702.00
1,508.00
Currency deposits, account
Pickwick Athletic Club at
Citizens State Bank
993.75
Currency deposits in Malone
Building Account at Jeffer-
son Park National Bank
6,625.00
1,462.50
Currency deposits in Pick-
wick Building Co. Account
in Jefferson Park Nat'l Bk.
11,375.00
Currency deposits at Jeffer-
son Park National Co.
60,000.00
Unidentified deposit 11/5/26
at Greenebaum Sons Bank
& Trust Co.
15,000
Unidentified deposit 4/7/26 at
Park Ridge State Bank
3,000
Unidentified checks depos-
ited at Jefferson Park Na-
tional Bank
8,000.00
Currency used in payment of
notes at Jefferson Park Na-
tional Bank
$22,000
$20,000.00
$18,000.00
$10,000.00
$32,800
$11,327.51
Currency used in payment of
notes at Norwood Park
Trust & Savings Bank
15,000.00
3,050
3,000.00
$ 500
Currency used to purchase
cashier's checks
20,500.00
48,600.00
2,445.00
700
1,821.25
1,135
Currency used to purchase
certificate of deposit at Citi-
zens State Bank
50,000.00
Currency used to purchase
securities
45,545.83
Currency used to purchase
stock of Jefferson Park Na-
tional Bank
4,000
Currency paid to architect,
W. F. McCaughey
600
Currency used in payment
of mortgages
4,273.00
Currency loaned to Fred H.
Esdohr
15,000.00
Totals
$109,648
$131,238.50
$242,578.83
$269,958.00
$65,665
$87,659.26
$45,225
*18 There was no account in the petitioner's books showing the sources of the foregoing currency deposits and other transactions. An accountant was employed who examined the petitioner's income tax returns from 1917 or 1918 to 1929 and prepared the 1930 return. He examined the petitioner's books and bank records. He endeavored to discover the sources of the bank deposits but was told merely that they were not income but came from accumulations on hand. The petitioner's books in 1926 did not reflect the currency deposits for that year. Only a portion of those made in 1927 was entered therein. They were not entered as cash receipts. The currency deposits made in 1928 and subsequent years were charged on the petitioner's books to the banks in which the deposits were made and were credited to the petitioner's property account or his investment account. These entries were not reflected currently but were made at a later date. The petitioner's bookkeeper made the entries either at the advice of the accountant or she would take them from the bank statements she received. Petitioner's total assets and net worth per books on December 31 of each of the years 1925 to 1932, inclusive, were as *19 follows: Year
Total Assets
Net Worth
1925 *
$ 12,969.17
$ 10,279.93
1926
84,363.75
84,337.07
1927
294,360.33
294,107.29
1928
1,145,153.18
570,167.24
1929
1,287,392.05
792,861.98
1930
1,402,496.23
733,690.87
1931
1,476,894.75
694,467.40
1932
1,483,345.96
613,653.54
In the course of his business, the petitioner borrowed extensively from various banks and from individuals. In 1924 he borrowed $124,000 from Jefferson Park National Company, the real estate department of Jefferson Park National Bank. In 1928 he borrowed $350,000 from the same company. The outstanding balance on these loans on December 31, 1932, was $361,961. On November 26, 1928, the petitioner received a mortgage loan from East Side Bank, Milwaukee, Wisconsin, in the amount of $80,000. Payments were made on this loan as follows: August 5, 1929
$20,000
November 19, 1929
20,000
January 6, 1930
20,000
November 22, 1932
20,000
(* by transfer to
M. E. White)
*20 In 1930, 1931 and 1932 the petitioner borrowed certain amounts from one M. E. White, for which he executed demand notes on the dates and in the amounts following: July 3, 1930
$25,000
September 19, 1930
6,500
December 17, 1930
20,000
January 3, 1931
10,000
May 27, 1931
25,000
July 1, 1931
20,000
July 30, 1932
25,000
November 22, 1932
20,000
(transferred from East
Side Bank, Milwaukee.) No payments had been made on these loans as of December 31, 1932, and the balance outstanding on that date was $151,500. On November 22, 1930, and July 1, 1931, the petitioner borrowed from and executed notes to N. O. Johnson in the respective amounts of $2,000 and $10,000. No payments had been made on these notes as of December 31, 1932, and the balance outstanding on that date was $12,000. On April 13, 1932, the petitioner borrowed from and executed *21 a note to Central Republic Bank & Trust Company, Chicago, Illinois, in the amount of $15,000. No payments had been made on this note as of December 31, 1932, and the balance on that date was $15,000. On May 17, 1932, the petitioner borrowed $4,000 from Citizens State Bank, Park Ridge, Illinois, executing a note therefor. This amount was paid on May 26, 1932. In addition to these specific loans, the petitioner borrowed extensively from Jefferson Park National Bank and Norwood Park Trust and Savings Bank in amounts totaling several hundred thousand dollars in the years 1924 through 1932. The petitioner paid substantial amounts of interest during some of the years here involved. In his returns for the years 1926 through 1929 he claimed interest deductions in the total amount of $38,651.72. From September 21, 1928 to December 31, 1931, inclusive, the petitioner had an account with Brunswick Balke Co. against which various charges and payments were made. The charges total $19,568.65, which were paid as follows: 1928
$ 500.00
1929
9,765.67
1930
6,000.00
1931
3,303.08
On September 26, 1928, the petitioner had an account with Rudolf Wurlitzer Company representing *22 a charge of $25,000 for an organ. He paid $10,300 on this account in 1928 and thereafter in 1929, 1930 and 1931 he paid at the rate of $150 per week, as follows: 1929, $7,800; 1930, $6,600, 1931, $300, thereby completing payment. The petitioner's books reflected cash in banks as of December 31 of each of the years 1925 to 1932, inclusive, as follows: 1925
$ 4,650.75
1926
3,028.24
1927
119.29
1928
(16,519.28)
1929
2,007.09
1930
( 111.51)
1931
1,879.79
1932
688.80
During 1928 the petitioner's account at Jefferson Park National Bank was overdrawn on 93 days and in 1929, 1930 and 1931 his account was overdrawn on 65, 70 and 30 days, respectively. Thirty-six of the overdrafts were in excess of $1,000 each, the largest being in the amount of $10,365.04. Prior to and during the taxable period the petitioner was a close personal friend of Henry L. Blim, an attorney practicing in Chicago. In 1919 Blim became associated with the petitioner in the Illinois Petroleum Products Company and acted as secretary, treasurer and director of that company. He continued in the same capacity with the American-Mexican Refining Company until 1927. During this period Blim *23 and the petitioner shared the office maintained for the respective companies. During the period 1919 to 1927 Blim acted as the petitioner's advisor and personal secretary and became closely associated with him in connection with his activities as a member of the Board of Equalization and of the Tax Commission. While the petitioner was chairman of the Tax Commission, Blim supervised his clerical office and had charge of the records. He attended all the meetings of the Board and of the Tax Commission in Springfield and also attended some private conferences. While performing these duties Blim became familiar with the tentative assessments on capital stock for various corporations. While Blim was connected with the petitioner in these activities tentative capital stock tax assessments were made by the Tax Commission against the Chicago Surface Lines which, in 1927, were represented before the Tax Commission by the law firm of Huff and Cook. In the spring of 1927 Blim severed his connections with American-Mexican Refining Company and became associated with Huff and Cook in that firm's activities on behalf of the Chicago Surface Lines, which were then having trouble with their tax assessments. *24 On October 13, 1927, the firm of Huff and Cook was paid by check the sum of $25,000 for representing the Chicago Surface Lines before the Tax Commission. One-half of this fee, or $12,500, was paid to Blim, who received a check for that amount from Huff and Cook on October 17, 1927. Blim deposited this amount in his bank account and on October 21, 1927, or between October 19 and October 21, he withdrew $7,500 in currency from this account. On October 21, 1927, the petitioner deposited $7,500 in currency in his account in Jefferson Park National Bank. On October 20, 1927, Cook disbursed part of the proceeds of the $25,000 payment received from the Chicago Surface Lines on October 13, 1927, by drawing a check on the firm in the amount of $7,500, payable to himself. Cook cashed the check on October 20, 1927, and received currency for it. The amount of the check was charged to the suspense account of the firm but Cook did not inform Huff as to what he did with the currency. Huff and Cook handled the capital stock tax assessment of the Chicago Surface Lines before the Tax Commission for the years 1928 and 1929, as well as for 1927. On December 4, 1928, that firm was paid $25,000 *25 by the Chicago Surface Lines for representing them with respect to their 1928 capital stock tax assessments. The payment was by check, which was deposited on December 5, 1928. On December 7, 1928, the proceeds thereof were partially disposed of by Cook's drawing a firm check for $16,000 which was cashed and was received in currency. Huff did not receive any part of this currency, although one-half of it was charged to his account on the firm's books. Cook did not tell Huff what he did with the $16,000. The Chicago Surface Lines paid Huff and Cook $20,000 with respect to the former's 1929 capital stock tax assessments. Payment was made by check dated January 3, 1930, which was deposited in the firm's account on the following day. On January 4, 1930, a check for cash in the amount of $16,000, representing disbursement of part of the $20,000, was drawn on the firm's account. Pursuant to Cook's request, Huff cashed the $16,000 check, receiving sixteen $1,000 bills. Huff placed the bills in an envelope, which was put in a strong box and held there for Cook. This amount was later handed by Huff to Cook, who immediately left the office. Huff was charged with one-half of the $16,000, although *26 he did not receive it and never saw the money thereafter. Cook died on June 7, 1930, and thereafter Thomas D. Huff, the other member of the firm, handled the Chicago Surface Lines' capital stock tax assessment matters for 1930. Huff saw the petitioner several times prior to the receipt of the final assessment letters for 1930. At one of their meetings the petitioner stated that he assumed the matter would be handled the same as theretofore. When Huff asked for an explanation he was told that Cook had made "a campaign contribution" of $15,000 the year before. Through his efforts Huff succeeded in having reduced by $100,000 the assessed value of one of the companies making up the Chicago Surface Lines. On September 10, 1930, Huff received a letter from the petitioner fixing the final capital stock tax assessments for the Chicago Surface Lines for that year. He was paid a fee of $20,000 by check dated September 11, 1930. Huff deposited the check in his bank and drew against it a check for $15,000 dated September 16, 1930. He cashed this check on the same day, receiving fifteen $1,000 bills, which he placed in a strong box in his office. He told the petitioner he could give him only *27 $10,000 and was informed that "for old friendship's sake" that would be satisfactory. A few days later Huff delivered the $10,000 in cash in person at the Tax Commission offices. For about 25 years the petitioner had known John W. Ellis, an attorney practicing in Illinois. In 1925 and 1926, Ellis represented the Pullman Company, among others, before the Tax Commission. Ellis received a fee of $15,000 for representing the Pullman Company before the Tax Commission in 1925. Of this amount he retained $5,000 and with the balance made a political "donation" to a "fund" which the petitioner was collecting. On January 7, 1927, Ellis received a check from the Pullman Company in the amount of $15,000 for handling its capital stock matters in the year 1926. Ellis cashed the check, receiving fifteen $1,000 bills. He retained $5,000 and delivered the balance to the petitioner's messenger. Prior to the receipt by Ellis of the second Pullman check, there were conversations between the petitioner and Ellis as to when the Pullman check would be in. After Ellis had contributed the $10,000 the petitioner called him in and told him he wanted the entire $15,000. Ellis refused to contribute the remainder. *28 On December 31, 1929, a certificate of deposit in the amount of $50,000 was issued by Citizens State Bank of Park Ridge to one W. F. McCaughey, Jr., an architect and a neighbor of the petitioner. The money represented by the certificate of deposit was actually deposited by the petitioner, who did not wish to make the deposit in his own name. Thereafter the petitioner used the money so deposited for his own purposes as he saw fit. McCaughey reported the sum on his income tax return but due to some offsetting losses, paid tax on only about one-half of it. In April, 1930, a formal conference was held in the office of the internal revenue agent in charge in Chicago concerning the petitioner's tax liability for the years 1926, 1927 and 1928. At the conference there were present Louis H. Wilson, head of the Fraud Section in the agent's office, special agent Clarence L. Converse, internal revenue agent Irving Bussey, the petitioner, his auditor, and a stenographer. The petitioner was asked to explain his currency deposits in those years and to give their sources. He did not answer the questions put to him relating thereto except to state that he did not care to discuss it. The petitioner *29 was also questioned with respect to the substantial increase in his net worth but gave no explanation. Shortly after the formal conference was concluded the petitioner was again questioned as to the sources of his currency deposits by Converse. Again the petitioner gave no explanation. At another conference the petitioner was shown deposit slips representing three deposits aggregating $120,000. He was asked to explain these deposits but was silent and asked that he be excused, saying he would give an explanation later. On or about June 8, 1922, the petitioner executed and filed a financial statement with Greenebaum Sons Bank and Trust Company, Chicago, in which he stated the amount of his cash on hand and in banks as of that date to be $6,000. On October 13, 1933, the petitioner was indicted in United States District Court for the Northern District of Illinois, Eastern Division, for unlawfully, wilfully and knowingly attempting to defeat and evade income taxes for each of the years 1929 and 1930 in the respective amounts of $58,478.32 and $1,101.58. The petitioner was tried before a jury and a verdict of guilty was rendered in July 1937 with respect to both years. Pursuant to such *30 verdict, judgment was entered by the court on July 29, 1937, and petitioner was sentenced to pay a fine of $5,000 and to be confined in the penitentiary for a period of two years. This judgment was subsequently affirmed by the United States Circuit Court of Appeals for the Seventh Circuit on January 6, 1938. Petitioner's application for certiorari to the United States Supreme Court was denied. The petitioner filed income tax returns for the taxable years 1926 to 1932, inclusive, in which he disclosed net income or losses and upon which he paid tax, all as follows: Net Income
Year
or Loss
Tax Paid
1926
$ 43,405.62
$3,878.64
1927
24,476.22
1,205.89
1928
19,968.47
242.57
1929
6,228.67
5.23
1930
(57,107.30)
None
1931
(56,436.98)
None
1932
(39,458.25)
None
The respondent determined in the notices of deficiency that petitioner realized during the taxable years "other income", represented by unidentified currency deposits, notes and mortgages paid with currency, and cashier's checks purchased with currency, and other currency transactions, the source of which was unexplained, in the following amounts: 1926
$109,648.00
1927
131,238.50
1928
242,578.83
1929
269,958.00
1930
65,665.00
1931
87,659.26
1932
45,225.00
*31 In his return for 1925 the petitioner reported capital gain of $55,000 realized from the sale of vacant property. The gain was computed as follows: Amount received, $90,000; cost, $35,000; gain, $55,000. In his return for 1926 the petitioner reported gain from the sale of vacant property as follows: Amount received, $90,000; cost, $55,000; gain, $35,000. This was the same transaction which had been reported in the 1925 return and was a duplication to the extent of $35,000 of the gain so reported in the earlier return. In his return for 1926, the petitioner claimed a charitable deduction for an alleged gift of $1,000 to the First Methodist Church of Park Ridge, Illinois. This deduction was disallowed by the respondent in its entirety. In 1926 members of the Mal Tierney Post of the American Legion of Park Ridge requested permission to use a hall which the petitioner owned, for their meetings. The petitioner did not wish to allow them to use this hall, which was furnished for women's club meetings, and suggested that they build their own home. He offered them a lot as a start. A few weeks later they returned with tentative plans for a home built of lumber. The petitioner recommended *32 that it be built of brick and offered to pay the difference in the cost. The difference amounted to $1,300, which amount the petitioner paid. In his return for 1926 the petitioner claimed a deduction of $2,680 representing the cost of the lot donated, plus the cash paid by the petitioner. The deduction was disallowed in its entirety. The petitioner was a stockholder in Home Realty Company, a corporation organized in December, 1922. Its authorized capital stock was $5,000, of which $2,500 was issued to the petitioner. The other $2,500 remained unissued. In January 1927, Home Realty Company was indebted to the petitioner in the sum of $125,521. In that month the corporation ceased to function and its assets were taken over by the petitioner. The assets at that time had a book value of $108,950.90. A part of the deficiency for each of the years in controversy was due to fraud with intent to evade tax. Opinion VAN FOSSAN, Judge: In this case there are two principal questions: (1) did the petitioner in the taxable years receive large amounts of income which he failed to report for taxation, and (2) was petitioner's failure to report such income due to fraud? The burden of proof *33 of error as to the first issue rests on the petitioner. The burden of proof of fraud rests on the respondent. The voluminous record herein contains many contradictions and inconsistencies. In the discharge of our duty of weighing the evidence and passing upon the credibility of witnesses, we have found it necessary to omit from our findings much of the evidence relied on by the petitioner. For the years 1926 to 1932, inclusive, the respondent added to the petitioner's income the respective amounts of $109,640; $131,238.50; $242,578.83; $269,958; $65,665; $87,659.26; and $45,225 which he designated "other income". Such sums were computed chiefly by resort to large unexplained bank deposits made in each of the years in question and to transactions in which notes and mortgages were paid off in currency, a method of ascertaining income which has been approved in many cases under comparable facts. See ; ; affirmed, ; ; . In the instant case all the deposits in question *34 were made in currency in the amounts set forth in our findings of fact. There was nothing on petitioner's books to indicate the source of such funds. Deposits were not entered on the books at all for 1926. In 1927 some of them were entered and from 1928 they appeared regularly on the books but in no case was there an explanation of the source. They were not entered as cash receipts but were credited to petitioner's "property account" or his "investment account". When called on by the revenue agents for an explanation of the source of the funds, no explanation was forthcoming. Faced with the facts as they found them, the Commissioner's agents were fully justified in treating the bank deposits as income, thereby placing on the petitioner the burden of proving that such deposits were not income. The petitioner testified repeatedly at the hearing before us that he had never looked inside hisbooks in his life. Nevertheless, he maintained that he had no income except what appeared on his books. At the hearing petitioner offered a fantastic explanation as to the source of these currency deposits, which explanation we are compelled to reject as untrue. His story of the source of the large *35 deposits in currency was to the following effect: Early in 1920 the petitioner was persuaded by a Colonel Proctor to go to South Dakota to oppose the candidacy of Frank O. Lowden for nomination as a candidate for the Presidency of the United States and to further the campaign for the election of delegates to the Republican National Convention pledged to General Leonard Wood. The petitioner's efforts were successful and upon his return to Chicago, Colonel Proctor gave him $500,000 in currency. Sometime in April or May of the same year, Colonel Proctor made a second donation to the petitioner in the sum of $200,000 as a reward for carrying Cook County for Wood. These amounts, together with the savings of other years, were placed in a safety deposit box in Greenebaum Sons Bank in Chicago. The petitioner continued to keep these sums in the deposit box, using it as a principal depository and from time to time clearing through the banks such amounts as were needed by him. The amounts so cleared accounts for the bank deposits and other unexplained items in controversy. In our opinion, one would have to be naive indeed to accept and believe the foregoing explanation. With the failure of *36 this explanation to carry conviction, petitioner's case falls to the ground. The petitioner testified that he received the major portion of the amounts involved in 1920, and that on December 31, 1925, he had about $1,000,000 in cash and securities in his safety deposit box. Despite this asserted fact, in a financial statement filed with Greenebaum Sons Bank and Trust Company petitioner stated the amount of his cash on hand and in banks as of June 8, 1922, to be only $6,000. Such divergent statements are utterly irreconcilable. Likewise irreconcilable with the Proctor story are petitioner's borrowings. During the years in controversy petitioner borrowed extensively, paying large amounts of interest on the loans. In some of the years here involved his account at the Jefferson Park National Bank was frequently overdrawn, often in large amounts. We find it impossible to believe that such a course of conduct would have been pursued by the petitioner had he in fact been in possession of such large amounts of cash which could readily have been used in his business transactions or transferred to his bank account. It is significant also that the petitioner's net worth as reflected on his *37 books increased commensurately with the bank deposits. The petitioner's refusal to give any explanation of these deposits to the revenue agents casts an even greater doubt upon the explanation now offered. In 1930, several conferences were held with the petitioner by the revenue agents at which they attempted to discover the source of these deposits. At that time the petitioner refused to give any explanation whatever. He did not answer questions relating thereto except to state that he did not care to discuss it. At one of the conferences, to questions concerning substantial increases in his net worth, the petitioner replied: "I guess you got me baffled. If I don't understand it, I don't know [that] I should talk." After the formal conference had ended, the petitioner was again questioned by Special Agent Converse as to the source of the currency deposits. At first the petitioner made no reply. When the question was repeated he said: "Mr. Converse, do you want me to dig a hole and jump into it?" The revenue agents knew nothing of the alleged gifts from Colonel Proctor until 1937, when the petitioner testified concerning them at the trial following his indictment for income tax *38 evasion for the years 1929 and 1930. The respondent undertook to prove by his evidence that the amounts involved represented bribes accepted by the petitioner while he was chairman of the Tax Commission. The record establishes that the petitioner received from attorneys representing various clients before the Tax Commission the amounts of $10,000 in 1925 or 1926; $15,000 in 1927; $16,000 in 1928, $15,000 in 1929, and $10,000 in 1930. Whether or not all the sums in question came from these sources is a question we need not decide. The respondent has determined that they constitute income to the petitioner. The petitioner has not brought forth any competent or convincing proof to the contrary. The evidence of record supports the respondent's determination. Disbelieving and discarding petitioner's explanation of the source of the deposits as we must, we hold that the petitioner has not proved respondent to be in error in holding that the petitioner received "other income" for each of the taxable years in controversy in the amounts determined. The second issue is to determine whether or not a part of the deficiency for each year was due to fraud with inten to evade tax. Fraud, as the *39 petitioner points out, is not to be presumed, nor is it lightly to be found. ; ; . In the last cited case we said: To establish fraud by direct proof of intention is seldom possible. Usually it must be gleaned from the several transactions in question and the conduct of the taxpayer relative thereto. Moreover, in assaying evidence to determine the presence or absence of fraud, the scales of justice must dip more heavily than in the ordinary civil case - a mere preponderance is not enough, the evidence of fraud must be clear and convincing. In the instant proceedings, we think fraud clearly appears. Much of our discussion above applies equally to the question of fraud and need not be repeated. In each of the years in controversy the petitioner made large currency deposits which he failed to report for income tax purposes. He resisted all attempts on the part of the Government to ascertain the source of these deposits until he was brought to trial for income tax evasion, at which time he offered the explanation which he has here put in evidence. This story we have *40 rejected as unworthy of belief. Under such circumstances, it is impossible for us to believe that the petitioner was actuated by other than fraudulent motives in failing to report these amounts for each year. As was said in the Gano case, supra: A failure to report for taxation income unquestionably received, such action being predicated on a patently lame and untenable excuse, would seem to permit of no difference of opinion. It evidences a fraudulent purpose. Consequently, the fraud penalties for each of the years in controversy are approved. Of the other issues in controversy, the first involves the alleged duplication in 1926 of gain realized on the sale of vacant property in 1925 and reported on the petitioner's return for that year. The evidence amply proves that, through an account's error, the gain on the sale of this property in 1925, which was reported in the petitioner's return for that year, was duplicated on his return for 1926 to the extent of $35,000. No evidence to the contrary was introduced by the respondent. Consequently, the petitioner is entitled to eliminate the amount of this duplication from his income for 1926. In his return for 1926 the petitioner *41 claimed a deduction for an alleged contribution of $1,000 to the First Methodist Church of Park Ridge, Illinois. This deduction was disallowed by the respondent upon the ground that the petitioner had received a bond in exchange for that amount. At the hearing the only evidence introduced on behalf of the petitioner was his own denial that he received anything in exchange for such sum. Under the circumstances of this case and the conclusions reached as to the untruthworthiness of petitioner's testimony, his denial is not sufficient to establish the truth of the matter. We can perceive no reason why other more competent evidence could not have been introduced to prove that the petitioner received nothing in exchange for his payment of $1,000, if such were indeed the fact. In the absence of such evidence or a showing that it was not available, we must sustain the respondent's disallowance of the deduction. The petitioner also claimed a deduction for 1926 in the amount of $2,680 as a contribution to Mal Tierney Post of the American Legion at Park Ridge. The deduction was disallowed by the respondent upon the ground that the contribution consisted of a vacant lot acquired at no cost *42 to the petitioner. The evidence of record, as set forth in our findings, sufficiently shows, we think, that in addition to the lot the petitioner contributed $1,300 in cash. No evidence was introduced, however, as to the value of the lot or its cost to the petitioner. Consequently, the deduction must be limited to the amount of cash so contributed. The last issue concerns the petitioner's right to a deduction for the year 1927 in the amount of $19,070.43, representing an alleged loss by the petitioner in that year on the liquidation of Home Realty Company. The petitioner did not claim a deduction therefor in his return for 1927 but now contends that such a deduction should be allowed. The evidence concerning this item is set forth in our findings of fact. It consisted solely in the testimony of an accountant who, in addition to stating the facts, expressed his opinion that the loss was deductible in 1927. We need not discuss the issue in detail. The evidence is clearly insufficient for the allowance of the deduction. From the meager facts of record, we are unable to determine the character of the loss arising from the amount of $125,521 for which the corporation was indebted *43 to the petitioner. There is no evidence of the actual value of the assets taken over by the petitioner. Likewise, there is no evidence as to the year in which the stock became worthless, except the stated opinion of the accountant that the loss was deductible in 1927. In the absence of more specific evidence, the deduction cannot be allowed. Cf. . Decisions will be entered under Rule 50. Footnotes
*. The petitioner's books apparently did not correctly reflect his entire assets, liabilities and net worth as of December 31, 1925. The record does not disclose what the correct amount should be. A bank statement executed and filed by the petitioner showed his net worth as of June 8, 1922, to be $237,500.↩
*. The petitioner's books apparently did not correctly reflect his entire assets, liabilities and net worth as of December 31, 1925. The record does not disclose what the correct amount should be. A bank statement executed and filed by the petitioner showed his net worth as of June 8, 1922, to be $237,500.↩